(79 South. 533)

No. 21660.

BAENSCH v. HEINICH et al.

(June 29, 1918.)

*(Syllabus by the Court.)*

DESCENT AND DISTRIBUTION ⟐⟐83—SUCCESSION—CONSPIRACY OF COHEIRS—REMEDY OF HEIR.

Where certain of the heirs conspire together to appropriate to themselves the property of the estate to which they succeed, and carry their conspiracy to successful execution, to the exclusion of their coheir, such coheir, though he may not demand the more severe penalty imposed by law, is entitled to such judgment against the wrongdoers, in solido, as will insure him his share of the inheritance.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Suit by Peter Baensch against Mrs. Gertrude Heinich, Mrs. Henrietta Lafon, and others, to recover his interest in their moth-

er's succession. Judgment for the plaintiff against the defendant Mrs. Lafon in a certain amount, and otherwise dismissing the suit, and plaintiff appeals. Judgment annulled, and judgment rendered for plaintiff against defendants in solido, decreeing plaintiff's interest in an inheritance, ordering a partition, and adjudicating his interest in furniture, household effects, etc.

E. M. Stafford and H. W. Robinson, both of New Orleans, for appellant. George E. Williams and N. E. Humphrey, both of New Orleans, for appellees.

### Statement of the Case.

MONROE, C. J. Plaintiff, as one of the five children and heirs of Mrs. Theresa Baensch, widow, brings this suit against his three sisters, Mrs. Heinich, Mrs. Ernst, and Mrs. Lafon, to recover his interest in their mother's succession, which, he alleges, they have conspired to appropriate, and have appropriated, to themselves. The fifth heir, Frederick Baensch, is not a party to the litigation. After disposing, as we think, properly, of several exceptions, and hearing the case on the merits, the trial court gave judgment for plaintiff, ordering Mrs. Lafon to account for a certain sum of $1,500, belonging to the succession and admitted to have come into her possession, and otherwise dismissed the suit. Plaintiff alone has appealed.

The facts, as we find them disclosed by the evidence, are as follows: The decedent was an elderly woman, having grown grandchildren, and, some three years prior to her death, which occurred on November 26, 1912, had suffered a stroke of paralysis, after which she remained at home, and for some time prior to her death, probably in bed. On August 29, 1911, while still at her own home, on Cleveland avenue, where she had lived for many years, she sold that property for $4,100, of which $3,000 were paid in cash, and the balance, of $1,100, in three notes, of $366.66 each, payable in 1, 2, and 3 years, respectively, and secured by mortgage, which notes, it is said, were at once converted into cash. Mrs. Lafon, who lived in the house, and Mrs. Heinich, who was there at the time, testify that they do not know what became of that money, and that they made no inquiry upon the subject. Mrs. Ernst says that she made some inquiry of Mrs. Lafon, who had no information to give her, and she appears to have been satisfied. Plaintiff and his brother had not visited their mother for some time, and saw little or nothing of her until after her death. It is shown that, upon the day of the sale thus mentioned, the three daughters rented a safety deposit box in the vault of the Whitney Central Bank & Trust Company, from which they afterwards produced considerable money for investment, or expenditure, for their own purposes; and it does not appear that, prior to that time, either of them, save Mrs. Heinich, had ever had occasion to rent such a box, nor, unless it was intended to be used for the safe-keeping of the money and notes received, as stated, by their mother, does it appear that they had such occasion at that time.

On December 23, 1911, while residing at the home of Mrs. Ernst, Mrs. Baensch sold to Camille Lafon, brother-in-law of Mrs. Lafon, the defendant herein, and son-in-law, as we infer, of Mrs. Ernst, for $3,000 cash, three improved lots owned by her on Ann street, and, the check of the purchaser having been given to Mrs. Heinich for collection, she obtained the money, and says she delivered it to Mrs. Baensch, in the presence, she thinks, of Mrs. Lafon. But neither she nor Mrs. Lafon, nor Mrs. Ernst, were able to say what thereafter became of it, though they denied that it had come into their possession and averred that they had never even attempted to learn why it was not found after their mother's death. On November 19, 1912, Mrs.

Baensch executed an act of sale whereby, for a recited consideration of $1,500 cash, she conveyed to her three daughters the last piece of real estate that she owned, being an improved lot on Palmyra street. She was then an inmate of Mrs. Lafon's home, where the act in question was executed, and the three defendants testify that they were all present, and that each of them paid, in cash, the $500, representing her proportion of the price of the property. The notary, before whom the act was executed, and the two subscribing witnesses testify that no money was paid. Mrs. Lafon says in her testimony that her mother took the $1,500 and kept it in the bed with her until she died, seven days later, and told her that she (Mrs. Lafon) was thereafter to pay such debts as she (Mrs. Baensch) might leave, and divide the balance of the $1,500 with Mrs. Ernst, to compensate them for nursing her, and that, after her mother's death, she paid the expenses of her last illness, funeral, and some other debts, including a bill for repairing the roof of the Palmyra street house, the whole amounting to $944, leaving a balance in her hands of $556; that she had not given Mrs. Ernst her share of that balance because Mrs. Ernst had told her to keep it until she needed it.

It is shown that, within three months after Mrs. Baensch sold the Cleveland avenue property, and defendants rented the safety box, Mrs. Lafon, aided by her husband, bought improved property on Cortez street for $5,000, of which $1,700 was paid cash, and the balance by her note at one year, secured by mortgage, for $3,300. On February 21, 1912, within about two months after the sale by Mrs. Baensch, for $3,000 cash, of her property on Ann street, Mrs. Heinich paid off a mortgage of $1,000, which, on February 20, 1911, she had imposed, as security for a loan of that amount, on certain real estate which, in 1910, her husband had caused to be placed in her name. On March 16,

1912, Mrs. Lafon, by that time a widow, bought from V. Leonard, two lots on Banks street for $1,800 cash. On August 23, 1912, the Mesdames Heinich, Ernst, and Lafon bought from William Dunn an improved lot on South Clark street for $3,500 cash. On November 19, 1912, the defendants bought from their mother her improved lot on Palmyra street for $1,500, as heretofore stated. On April 14, 1913, Mrs. Lafon paid her mortgage note for $3,300, and the mortgage was canceled. According, therefore, to the undisputed evidence, omitting the notarial act purporting to show the purchase by defendants of the Palmyra street property, Mrs. Lafon is shown to have invested, between August 29, 1911, the date of the first sale by Mrs. Baensch, and April 14, 1913, $7,966.66, and if we add thereto the $944, which she says she used in paying Mrs. Baensch's debts, funeral expenses, etc., we have a total of $8,910.66 expended by her within that period; and in that connection we may add that she testifies that there is a double tenement house on the Banks street lots, one side of which she rents and the other side occupies, and that the property is worth $4,800, from which it would appear that she has improved the lots since she bought them, since it seems hardly probable that they would otherwise have appreciated in value from $1,800 to $4,-800 in so short a time. Leaving that question as it stands, we find that Mrs. Ernst, between August 29, 1911, and November 26, 1912, the date of her mother's death, invested $1,166.66, or, if we include the $500 said to have been paid for a one-third interest in the Palmyra street property, $2,166.66, and that Mrs. Heinich made investments, including $1,000 paid for the release of a mortgage, and the $500 said to have been paid for her interest in the Palmyra street property, amounting to $3,166.66.

As to the sources from which the money thus invested or expended is said to have

been derived, we find as follows, mainly from the testimony of the defendants, to wit:

From the testimony of Mrs. Lafon, it would appear that, in 1908, she was married to August Lafon, who was without means at that time, but could get money from his father when he needed it. His father had started him in the dairy business, which he was then carrying on. It lasted a year or more, when he sold it. She does not know what he did with the proceeds. His father then started him in business as a butcher, which lasted a year and a half, perhaps longer, when he abandoned, or sold, that business. His father would give him money to start a business, and he would sell the business and use the money for other purposes. After he abandoned or sold the butcher business, his father bought him an ice wagon, shortly after which, as we infer, his father died, and the ice peddling business also soon expired, followed, on December 8, 1911, by the death of August Lafon himself, leaving his widow, with one child, issue of his marriage and an estate manifestly just inherited from his father, appraised, December 28, 1911, at $2,216, and composed of the following items, to wit: One note for $1,000, with interest paid to February 15, 1911, and extended to February 15, 1912; one note, originally for $8,966, but reduced by payments on account to $966, past due, with accrued interest, appraised at $966; a one-third interest, valued at $250 in a lot on Scott street. Mrs. Lafon testifies that she had saved, at the time of her marriage, $800, from her earnings in teaching music, and that her husband's uncle had given her $500 and her aunt $500, and she speaks vaguely of other moneys that were given her. She did not deposit her money in bank, but kept it at home, and states that she so kept it until she deposited it in the safety box which she and her sisters rented on August 29, 1910. She seems to convey, or to intend to convey, the idea that she was authorized by the court to invest the proceeds of the notes inventoried in the succession of her husband in property purchased in her own name. Thus in the course of an examination by her own counsel her attention was called to a memorandum, apparently made by her, and she was asked certain questions concerning it, to which she made answer that it showed the property on Clark street, "$500 for the Palmyra street property," and the examination proceeds:

"Q. I asked you what property, other than real estate, you got from the succession of your husband, not the real estate there, notes, money, or anything else. A. I got a note for $1,000, and I haven't got the interest here (meaning on the memorandum)—it is $70—and one note of $966, and interest on that, $500, with the interest, $1,605 (evidently a miscalculation) for the note. Q. That is the amount you realized on those notes? A. Yes, sir. Q. What did you do with that money? A. Which money? Q. That you realized on those notes? A. I helped buy that property on Clark street. Q. It helped buy that property on Clark street? A. Yes, sir; and, as I told you, I got money from music lessons. Q. When you referred to your money with which you purchased this property, is that the money you spoke of? A. Yes, sir. Q. Accounted for here? A. Yes, sir. * * *" Cross-examined: "Q. Mrs. Lafon, part of the estate of your husband belongs to your child? A. Yes, sir. Q. Referring to the $1,000 note, the $966 note, and the $500 interest on the note, what do those three first items you called out—do they belong to the minor or to you? A. Part to me and part to the minor; and the court granted me the use of it for the child. Q. Now, this $1,605; that is notes? A. Yes, sir. Q. Does that belong to you or to the minor? A. I don't know who it belongs to, me or the minor. Q. That is succession property? A. That is not succession property; Mr. Walker didn't put it in. Q. It came from the succession? A. Yes, sir. * * * Q. The child's interest, according to your idea, is only in those items of cash and notes and the interest on the notes? A. Yes, sir; the child has no interest in the real estate. I took the money and paid for it. The court allowed me that, and I bought the property with it."

Elsewhere she testifies that her husband gave her the Cortez street property; i. e., the three lots purchased by her on November 25, 1911, for $5,000, of which she paid $1,700 cash, and for the balance, of $3,300, gave her note, which she paid April 14, 1913, 17

months after the death of her husband. The memorandum, referred to in the foregoing testimony, reads as follows:

| | |
|---|---:|
| Doctor | 175.00 |
| Funeral | 400.00 |
| Roof | 165.00 |
| Church | 35.00 |
| Dr. Borey | 75.00 |
| Nurse | 34.00 |
| Shroud | 25.00 |
| Drugs | 20.00 |
| | 929.00 |
| Wake | 15.00 |
| | 944.00 |

Property bought by me and accounted for:
4,800.00 lot and house on Banks St.
1,166.00 Clark St.
  500.00 Palmyra St.

6,466.00
1,500.00
  944.00

  556.00 from mother amount of 1,500.00
Amount rec'd from succession of August Lafon:
1,000.00 notes.
  966.00 notes.
  500.00 int. on notes.
1,605.00 from note.

4,071.00 cash gotten from succession.
6,466.00

4,071.00
2,395.00
  800.00 had from lessons.

1,595.00
  500.00 Mr. G. Lafon.

1,095.00
  500.00 aunt gave me.

  595.00

In her testimony she arrives at the figures 1,605.00, by adding to the amount of the $966 note the $500 of alleged accrued interest, which, however, should make $1,466. In the memorandum, she adds the 1,605.00 to the 966.00 and the 500.00, and, with the 1,000.00, makes 4,071.00. She does not account for the possession of the $3,300, with which, on April 14, 1913, she paid the balance of the purchase price of the Cortez street property, nor, save by the statement that her husband gave her that property, does she account for $1,700 with which she made the first payment thereon, less than a fortnight before the death of her husband.

Mrs. Ernst, according to her testimony, had been married 25 years, had two children, one of them married, to Camille Lafon as we take it. Her husband at the time that she testified was keeping a saloon; had been keeping it 2 years; had previously kept saloon and grocery for 20 years; had never owned the building in which the business was conducted; but did own properties on White and on Banks streets, which he had bought 8 or 9 years before. One place is worth $1,800, or $2,000; the other $1,600 or $1,700. One place he bought on time, and paid so much a month; the other he bought through the Homestead. In 1913, also, the Homestead built a house for them on Hamilton street. During those years, while her husband was paying, month by month, for the properties mentioned, and prior to that, she received $5 per week for her services in the grocery, and also made money by selling old sacks, boxes, and barrels. She first deposited her money in the Germania Savings Bank, and afterwards in the Interstate Bank. The most that she ever had in the bank at one time was about $300, or a little more. She even used that, and other money, in buying property, with her sister. The other money was money that she had at home; always had $2,000 there; did not always have it, but saved it up. Being asked where the money came from with which the South Clark Street property was paid for, she answered that she gave Mrs. Lafon, $1,166 of her money that she had worked for; that she did not have it in any bank; that it was not kept at home; that she did have it in the Whitney Bank, with Mrs. Heinich and Mrs. Lafon; that she had about $1,800 there; that just before going to California, which she did in the latter part of August,

1911, she gave Mrs. Lafon $1,900, and told her, "when she got ready to go to the bank box," to put it in with hers; that she worked for that $1,900, and her husband gave her some of it; that she had at one time over $2,000; that she took $300 with her on her trip to California. She does not fix the exact date of her departure for California, though she was asked several times when she left here, her answers being the latter part of August, 1911, so that it may have been upon the morning of the 29th of August or the evening of the day before; nor does she say how or why it happened that she and her sisters should have agreed in advance that on the 29th they would rent the bank box and keep their money in it together, or why they did not rent it before she left the city. From a statement from the Germania Bank (Commercial Germania Trust & Savings Bank), it appears that Mrs. Ernst never had an account in that institution, and a statement from the Interstate Bank shows that the largest amount she ever had on deposit there was, on July 11, 1911, $247.92.

Mrs. Heinich's husband was a cistern maker, but in 1910, his establishment was destroyed by fire, and he seems, about that time, to have found some reason for putting his property in the name of his wife. She testifies that he sold some lots on Bienville street for $6,000 or more, which he turned over to her and she kept in a bank box, and in September, 1910, he conveyed a lot in square 581 and two lots in square 730 to Peter Baensch, for the recited consideration of $5,500, of which $3,400 were said to be paid in cash, and the balance, of $2,000, by the assumption of a mortgage already resting on the property, and on the same day, before the same notary, and for the same recited consideration, Baensch conveyed the same property to Mrs. Heinich. On February 20, 1911, Mrs. Heinich mortgaged the property thus conveyed to secure payment of $1,000, which she then borrowed, to meet the expense of establishing a fishing camp, in which her husband had then embarked and is still operating, from which it may fairly be inferred that whatever money had previously been intrusted to Mrs. Heinich by her husband had been expended. Mrs. Heinich was asked why she rented the bank box with her sisters in 1911, and she replied, "I guess we got and paid for it about the time we needed it, when we thought we needed it." She further stated that she herself had a box in another bank at that time; that the money that she put in the Whitney bank box came from her husband; that it was between $1,000 and $2,000; that her husband gave it to her at different times; that he gave her everything that he made, just as he made it, etc.

John R. McMahon, testifying in 1915, said that, several years before, Mrs. Heinich had told him that her brothers were away from the family and had never done anything for their mother, and that the property should go to the girls; that she told him at another time that she had taken $1,000 from the bank box, which she and her sisters held together, to pay off a mortgage, and that Mrs. Lafon and Mrs. Ernst wanted her to account to each of them for one-third of the amount so taken; that Mrs. Lafon had told him that she had taken money out of the bank box with which to make payments on property purchased by her; that the box was in her mother's name; that she wanted Mrs. Heinich to give her her share of the $1,000 that she had taken out of the box.

Peter Baensch, plaintiff, testifies that, in 1912, he had a conversation with Mrs. Ernst at her house, and she told that she did not see why their two sisters had not given him his share of the property; that they had taken the money from the cash box and did not want to give her her share; that she

was willing to give him his share; that the property had been transferred in order to keep him from getting anything; that the Palmyra street property had been so transferred, and nothing had been paid for it; that the sisters had taken the proceeds of the Cleveland avenue property to the extent, as he thought, of $3,600, and bought the Clark street property with it (the South Clark street property was bought for $3,500); that the $3,000 received for the Ann street property had been put in the box, and that thereafter Mrs. Heinich had taken $1,000 with which to pay off a mortgage, and that there was about $1,800 left in the box which Mrs. Lafon used to finish paying for her house on Banks street. He further testified that Mrs. Heinich, after the death of their mother, came to the shop, where he was working, and said to him, "There's no use for you trying to get anything, because we got it fixed so you ain't going to get nothing;" that he had not seen his mother for, say, a year before her death, and, as may be inferred, did not see her until after her death. It is conceded that Mrs. Lafon and Mrs. Ernst, between them, succeeded to all of Mrs. Baensch's furniture, jewelry, and other personal effects, and an informal offer, of sorts, was made on the trial, to turn it over to plaintiff, but, as the property had been scattered about a good deal and not collected together again such an offer could hardly have been made good, if accepted.

### Opinion.

The evidence convinces us that the defendants deliberately conspired together to appropriate, to themselves the estate of their mother, to the exclusion of their two brothers and coheirs, and carried their conspiracy to successful execution. The delivery into the hands of the mother of the proceeds of her Cleveland avenue and Ann street properties, amounting to $7,100, was, in effect, a delivery into the hands of those who had charge of her, and their denials that any part of those funds came into their possession, and that they made no inquiry, or merely formal inquiry, concerning them, are, in the light of the surrounding circumstances, impossible of belief.

The circumstances are set forth in considerable detail in the preceding statement, and a few only of the salient ones need be here recapitulated. Mrs. Baensch was old, partially paralyzed, and comparatively helpless, and lived at an expense not exceeding $20 or $25 a month. Her daughter Mrs. Lafon lived in the house with her, and her daughters Mrs. Ernst and Mrs. Heinich were her constant, and perhaps only, visitors. They were therefore bound, by every consideration of interest, as well as obligation, to see to it that her property should be neither lost nor squandered, and it would exceed the bounds of credulity to believe that two amounts of $4,100, and $3,000, which they knew came into her hands at intervals of several months, disappeared within the short period which intervened before her death, without their knowing what became of it, or at least exhibiting some curiosity upon the subject, after her death. In that connection, it may be remarked that, save in the act of sale, the record contains no information concerning the disposition of the three notes that were given in part payment of the price of the Cleveland avenue property, and we learn only through an unchallenged statement in the brief of defendant's counsel that they were, at once, converted into cash. As we take it, however, Mrs. Baensch was not in a condition to transact that business, and the inquiry suggests itself, Why and for what reason, and by what authority, and by whom, were the notes so converted? A partial answer would seem to be that cash may more readily be disposed of, without leaving traces, than notes, which must be paid by one person and collected by another, and that, if the pro-

ceeds of the Cleveland avenue property were to be disposed of, to the exclusion of Mrs. Baensch's two sons, it was necessary that it should be done speedily, and not await the maturity of the notes. For the rest, it is to be presumed that the notes were reduced to cash by those who were interested in having them discounted, and upon their own authority. In view, then, of the fact that approximately $4,100 was to come, and did come, into the feeble hands of Mrs. Baensch on August 29, 1911, it is evident that the interests of the defendants, not to mention their obligation, demanded that some arrangement should be made for its safe-keeping, and it is an undisputed fact that, upon that same day, they united and rented the deposit box in the vault of the Whitney Bank, and there was an impression, somewhere, at the time or afterwards, that it was rented in the name of their mother. It appears, however, that it was rented in their own names; that Mrs. Lafon, who from the days of her youth, during the vicissitudes of her married life, to a husband who had failed in everything that he had undertaken, and notwithstanding that she had been subjected to the travail and expense of motherhood and of the care of an infant, had saved $1,800 or more by keeping it securely at home, conceived for the first time the idea that she needed a bank box; that Mrs. Ernst, who for 19 years had assisted her husband in his grocery business, during the greater part of which time, he had been buying small properties by small monthly payments, and who had been paid $5 per week for her services, besides making a profit by the sale of old sacks, boxes, and barrels, and, from her earnings had saved, for the most part, by keeping it at home, $2,300, suddenly concluded that she, too, must have a safety deposit box; and that Mrs. Heinich, who less than six months before had mortgaged the property which her husband had caused to be put in her name, in order to borrow $1,000 wherewith to pay their expenses, which debt was still unpaid, reached the same conclusion, though she then had such a box, which, for aught that appears, was large enough for her requirements. And so they rented the box. But if the reasons which they give in each case appear inadequate, their reasons for renting a box in common are more so; in fact, they give no reasons for that at all, although boxes of that kind are most frequently made the receptacles of papers or mementoes which, by reason of their intrinsic value or otherwise, are not submitted to the inspection of others. In the absence of explanation therefore—and there is none—it seems incomprehensible that, after, as they say they did, hoarding their savings separately, they should, without apparent reason, decide to put them together, in the same box, and that, as the evidence shows, a box with but two keys; and more incomprehensible still is the fact, that, though the box was rented upon the same day that their helpless mother, living in the house with Mrs. Lafon, and constantly visited by the others, received $4,100 in cash, they do not admit, but deny, that it ever entered into their contemplation that the money so received should be deposited in their box. As we see the matter, however, unless in renting the box they had in view the safe-keeping of the money so received by their mother, they are so entirely abnormal as to defy classification. Conceding that they felt under no obligation to their mother or to their absent coheirs with respect to the safety of the fund in question, they themselves were interested in that fund, as the heirs of their mother, whose days were numbered, and the normal individual will usually care for that which belongs to him, whether in præsenti or futuro. The fact that, as their mother, in quick succession, sold for cash, which immediately vanished, the several pieces of real property of which she was the owner, her daughters acquired property, and that, instead of opening her succession,

BAENSCH v. HEINICH

when she died, in the house of Mrs. Lafon, as it was the imperative duty of Mrs. Lafon to have done, that lady left the succession unopened while she and her sisters appropriated all the personal property belonging thereto, without giving their brothers an opportunity to be heard upon the subject, is not only significant in itself, but is strongly corroborative of the direct testimony of plaintiff and McMahon, as is also the circumstance that some of the facts alleged in the petition and supplemental petition, and proved beyond controversy on the trial, could only have come to the knowledge of plaintiff in the manner testified to by him and McMahon, i. e., by means of statements made by one or the other of the defendants.

As between the alternatives, then, and without further extending this opinion, we conclude that defendants are normal, in the sense that they contemplated putting the $4,100, received by their mother from the Cleveland avenue property into the box in question, and that they did as they contemplated. We further conclude that they thereafter withdrew that money from the box and used it for their own purposes, and we are of the same opinion with regard to the $3,000 received as the price of the Ann street property. As to the Palmyra street property, we are satisfied that defendants paid no part of the price recited in the act whereby that property was conveyed to them.

The prayer of the original petition, so far as it need be quoted, reads:

"Petitioner have judgment against * * * the said Mrs. Heinich and said Mrs. Lafon and the said Mrs. Ernst, decreeing them to account to petitioner for the cash, jewelry, furniture, household effects, and rents fraudulently misappropriated by them, amounting in all to the sum of $4,000, and that petitioner may have judgment against them for one-fifth of the total amount shown by said accounting, in solido, together with legal interest from dates of misappropriation of said funds, property, etc.; and, further, that petitioner may have judgment against them, decreeing him the owner of one-fifth of the real estate above described, and ordering the same to be sold at public auction to fix the proportion between him and the said co-owners.

"Petitioner further prays for costs and for all general relief."

By supplemental petition, plaintiff makes some allegations concerning details not set forth in the original petition, and which, being made somewhat in the dark, are not, in all respects, in accord with the facts as disclosed by the evidence. The prayer of the supplemental petition is for judgment as prayed for in the original petition.

The Civil Code declares that:

"Art. 1029. Heirs, who have embezzled or concealed effects belonging to a succession, lose the faculty of renouncing; and they shall remain unconditional heirs, notwithstanding their renunciation, and shall have no share in the property thus embezzled or concealed."

As will be seen, however, plaintiff is not here seeking to enforce the last clause of the article thus quoted, and we shall confine our decree within the limits of his prayer. In giving their testimony, defendants (Mrs. Ernst and Mrs. Lafon) made a return, concerning the furniture and jewelry which their mother had owned, saying that some of it had been given to them, and that other portions of it were of little value, and an informal offer was made by their counsel to turn some, or all, of that property over to plaintiff. It was not shown what rents, if any, in which plaintiff was interested were collected by defendants. Of the real estate referred to in the above-quoted prayer, the properties owned by Mrs. Baensch, on Cleveland avenue and Ann streets, respectively, were sold to third persons, not parties to this proceeding, and, though defendants, as we think, appropriated the proceeds, the titles of the purchasers appear to be good. At all events, they cannot be attacked in the absence of the present owners. As to the real estate acquired by defendants, whether separately or together, on Cortez, Banks, and South Clark streets, respectively, whether under our law or jurisprudence it is sub-

ject to what is elsewhere known as a constructive trust in favor of plaintiff, is a question which we do not consider it necessary to inquire into for the purposes of this case, since we think plaintiff's demands may be otherwise satisfied. The conveyance of the Palmyra street property was in fraud of plaintiff's rights as a forced heir of his mother, and his interest in the property will be recognized. C. C. 2444. Defendants having failed to account for $7,100 belonging to their mother which went into their hands, and should have been found in her succession, are liable, in solido, to plaintiff for one-fifth of that amount, with interest; and they should account more definitely for the furniture, jewelry, and household effects, which were, or should have been, found in the succession.

It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment in favor of Peter Baensch, plaintiff herein, and against Mrs. Gertrude Heinich, Mrs. Henrietta Lafon, and Mrs. Elizabeth Ernst, defendants herein, in solido, in the sum of $1,420, with legal interest thereon from November 26, 1912, until paid. It further ordered that plaintiff be decreed the owner of an undivided one-fifth interest in the property which was the subject of a conveyance from their mother to defendants, by act before E. M. Stafford, notary, of date November 19, 1912, and which is described as:

"A certain lot of ground, together with all the buildings and improvements thereon and all the rights, ways, privileges, servitudes, and advantages thereunto belonging or in any wise appertaining, situated in the first district of the city of New Orleans, in square bounded by Palmyra, Gasquet, Rochblave and Tonti streets, designated as lot No. 20, on plan drawn by Arthur De Armas, deputy city surveyor, dated November 29, 1868, and deposited in the office of Abel Dreyfous, as Book 59 of his Book of Plans, according to which, said lot measures, in American measure, twenty-seven feet one inch front on Palmyra street by one hundred and five feet, ten inches and three lines in depth, between parallel lines."

It is further ordered that a partition of said property be effected in such manner and upon such terms as may hereafter be ordered by the district court. It is further ordered that plaintiff be recognized as the owner of an undivided one-fifth interest in the furniture, jewelry, and household effects, found, or which should have been found, in the succession of Mrs. Theresa Baensch, the mother of these litigants, at the time of her death, and as entitled to an inventory and partition of the same, to be more specifically ordered by the district court. It is further ordered that defendants pay all costs of this litigation which have accrued up to this time, and that this case be remanded to the district court, to be further proceeded with according to law and to the views expressed in the foregoing opinion.